92 A.2d 311 (1952)
FIDANQUE et al.
v.
AMERICAN MARACAIBO CO. et al.
Court of Chancery of Delaware, New Castle.
November 5, 1952.
William S. Potter and James L. Latchum, of Berl, Potter & Anderson, Wilmington, and Robert B. Block and Francis S. Levien, New York City, for plaintiffs.
Alexander Nichols, of Morris, Steel, Nichols & Arsht, and Stanley Law Sabel, and Daniel E. Chieco of Chadbourne, Hunt, Jaeckel & Brown, New York City, for defendant American Maracaibo Co.
Henry M. Canby, of Richards, Layton & Finger, Wilmington, for defendant Frederick R. Ryan.
*313 BRAMHALL, Vice Chancellor.
Maracaibo is engaged in the production of crude oil and is the owner of royalties and other oil interests in west Texas, Venezuela and Colombia. The holdings in Venezuela and Colombia are designated respectively as the San Antonia de Guanipa concession and the Barco concession. For several years prior to February, 1951, by reason of a substantial indebtedness, Maracaibo was unable to expand its holdings in the oil field. In February of 1951, when this indebtedness was paid in full, Maracaibo then had sufficient cash with which to invest in any oil project which might seem attractive to its management and board of directors. With this purpose in mind it was considered advisable to place on the board of directors men with more experience in the oil industry. Around the middle of 1951 George Easley was made a director. Somewhat later Hadley Case was also added to membership of the board of directors.
It was also recognized that in such an expansion program more aggressive management would be required, since the then president, Frederick R. Ryan, who had *314 been a director of Maracaibo since 1924, and its president since 1935, was then over 70 years of age, in poor health, and was admittedly unable to carry on in any project for the expansion of Maracaibo's interests. A standing committee was also created to consider the advisability of accepting any worthwhile project which might be offered. A number of projects were considered, all of which were for one reason or another eventually rejected. Hadley Case, who was about to become a member of the board of directors of Maracaibo, suggested that Maracaibo acquire his companies, stating that he would only be interested in such a proposition in the event that the management of Case Pomeroy should participate in the management of Maracaibo.
The directors of Maracaibo agreed to consider Case's proposal. It employed one Richard C. Dennis, an expert in appraising values of oil properties, to make a preliminary investigation of the Case Pomeroy properties, to use the result of another appraisal on the domestic properties of Maracaibo with respect to reserves, and to use his own studies and the report of another appraiser of the de Guanipa concession in appraising the South American properties. Dennis was further instructed to get in touch with the management of Case Pomeroy and obtain their basic data with reference to their properties.
Subsequent to the completion of his appraisal but prior to his report to the board of directors of Maracaibo, Dennis was informed by Easley, a director of Maracaibo, of the occurrence of certain events on the Case Pomeroy properties which Case claimed should be considered in the appraisal. Dennis was instructed by Easley to reconsider the properties involved by reason of this later development and make whatever appraisal he considered proper in the light of the later information. As a result of these later instructions, Dennis modified the appraisement by increasing the value which he had placed upon the properties of Case Pomeroy in question by the sum of $321,809.
Subsequently, after checking Dennis' report and obtaining advice from others experienced in the oil industry, the board of directors approved the execution of an agreement for the exchange of a block of stock of Maracaibo, amounting to 36.5764 per cent of its stock to be outstanding, to the stockholders of Case Pomeroy in exchange for all of the outstanding stock of Case Pomeroy, subject, however, to the approval of the stockholders of Maracaibo, at a meeting to be called for that purpose. At the same time the board of directors, in like manner, also approved a contract providing for the employment of Ryan as a consultant at a salary of $25,000 per year, and, further, that upon the death of Ryan, his widow, if she should then be living, should receive annually the sum of $5,000 for a period of five years or until her death, whichever event should first occur. A further consideration set forth in this contract was the agreement of Ryan not to engage, directly or indirectly, in any business competing with Maracaibo.
The board of directors of Maracaibo, after due notice, called a meeting of the stockholders of Maracaibo for May 20, 1952, to consider the advisability of these proposals. Prior to the meeting plaintiffs, as stockholders in Maracaibo, brought this action to enjoin Maracaibo from carrying into effect the exchange of stock as provided in the agreement for exchange of stock and from carrying into effect the employment of Ryan as a consultant. A restraining order was issued by this court in accordance with the prayer of the complaint. At the meeting of stockholders the agreement for exchange and the contract with Ryan were ratified by approximately 85 per cent of the shares of stock represented and approximately 57 per cent of the total outstanding stock of Maracaibo. A few days prior to the date set for the trial, by stipulation of counsel, Ryan was added as a party defendant to the cause.
The depositions, testimony and exhibits offered in evidence in the trial of this case are so voluminous that a discussion of the evidence in detail would be more confusing than helpful. I shall therefore confine my discussion of the testimony to the evidence which, in the consideration of the particular question, I shall consider to be pertinent.
*315 Plaintiffs contend that the consummation of the agreement for the exchange of stock should be enjoined by reason of:
(1) The gross neglect of Maracaibo's interest on the part of the management and board of directors and in particular the alleged fraudulent actions of the director Hadley Case;
(2) The fact that the agreement for exchange of stock would in effect accomplish a merger of Maracaibo with the Case Pomeroy companies without compliance with the statutory requirements;
(3) The fact that the ratification of the action of the board of directors by the stockholders is ineffective because of inadequate consideration, the lack of knowledge on the part of stockholders of all the pertinent facts surrounding the adoption by the board of directors of the agreement for exchange and the fraud of Hadley Case.
Defendants contend:
(1) That the agreement for exchange was entered into in good faith and with due diligence, based upon full and adequate facts and the advice of independent and qualified experts;
(2) That the over-all values of the stock of the two companies are highly favorable to Maracaibo;
(3) That any issues which might have been raised as to the action of the board of directors of Maracaibo have been removed by the ratification of its stockholders.
In the determination of this case I am called upon to consider:
(1) Is the agreement for exchange of stock in effect a merger without compliance with the statutory requirements;
(2) Was there any fraud on the part of Hadley Case or others involved in the transaction;
(3) Did the directors of Maracaibo act in good faith and with due diligence;
(4) Does the contract between Maracaibo and Frederick R. Ryan constitute a gift or waste of corporate assets;
(5) What effect, if any, does the ratification by the stockholders of Maracaibo have upon the agreement for exchange of stock or the contract with Ryan?

1. Does this transaction constitute a merger?
Obviously the transaction is not a merger under Sec. 59, Rev.Code 1935, § 2091, since no attempt has been made to comply with that section of the General Corporation Law. Even if there had been such an attempt, it would not have been successful because the agreement was not ratified by two-thirds of the stockholders of Maracaibo as required by the statute. Since the statute sets forth in detail the procedure to be followed in the event of a merger, it is not a common law merger. See Argenbright v. Phoenix Finance Co. of Iowa, 21 Del.Ch. 288, 187 A. 124, 126. Neither can I agree with plaintiffs' contention that it is a de facto merger. Strictly speaking, a merger means the absorption of one corporation by another, which retains its name and corporate identity with the added capital, franchises and powers of the merged corporation. It is the unit of two or more corporations by the transfer of property to one of them, which continues in existence, the others being merged therein. Argenbright v. Phoenix Finance Co. of Iowa, supra; Fletcher Cyc. Corp., (Perm. Ed.) Vol. 15, Sec. 7041, p. 8.
In this case Maracaibo acquired all the outstanding capital stock of the Case Pomeroy companies, issuing in exchange therefor its own stock. The agreement is between Maracaibo and the stockholders of Case Pomeroy. There is no provision for the liquidation or dissolution of Case Pomeroy. On the contrary, they are continuing to operate as independent units. According to the plan of the management of Maracaibo, because of an unfavorable tax situation, the management of Maracaibo intends to develop its holdings through Case Pomeroy, in which this tax situation does not exist. It is therefore conceivable that Case Pomeroy in the future might even be more active than formerly.
Whether a particular transaction is in reality a merger or otherwise depends to a great extent on the circumstances surrounding each particular case and in determining *316 the question all the elements of the transaction must be considered. There is no magic in the words applied to the transaction. Calling it a merger does not necessarily make it so and giving it another name does not prevent it from being a merger. Fletcher, Cyc. Corp. (Perm. Ed.) Vol. 15, Sec. 7044, p. 20, n. 62. See Vale v. Dupont, 7 W.W.Harr. 254, 182 A. 668, 103 A.L.R. 946; Metropolitan Edison Company v. Commissioner of Internal Revenue, 3 Cir., 98 F.2d 807, 809. See also 19 C.J.S., Corporations, § 1604, p. 1367.
It is well settled that ownership alone of the capital stock in one corporation by another does not create an identity of corporate interests between the two companies, or render the stockholding company the owner of the property of the other. Owl Fumigating Corporation v. California Cyanide Co., D.C.Del., 24 F.2d 718.
The transfer of the assets of one corporation to another does not, of itself, create a merger. Butler v. New Keystone Copper Co., 10 Del.Ch. 371, 93 A. 380; Argenbright v. Phoenix Finance Co., supra.
Plaintiffs apparently admit the force of these decisions but argue that the instant case presents the unique situation of a transaction contemplating merger in every respect, averring that the statutory formalities were admittedly dispensed with only to escape compliance with an undesired tax consequence. Assuming this contention to be correct, I do not agree with plaintiffs' conclusion that a de facto merger is created. As heretofore stated, the identity of the Case Pomeroy Corporations and the assets of those corporations, either in type or amount, are not impaired or changed in the slightest respect. The issuance of stock for the stock of these corporations is authorized by Sec. 14 of the General Corporation Law, Rev.Code 1935, § 2046. The proportionate share acquired by the stockholders is not at all in proportion to the interest which they had in Case Pomeroy. See Lackey v. State School Tax Department, 5 W.W.Harr. 507, 168 A. 194; Vale v. Dupont, supra.
If the transaction had been one in which in some manner the assets of Case Pomeroy would have been so impaired that the rights of creditors or dissenting stockholders might have been jeopardized, there would then have been merit to plaintiffs' contention. See Drug, Inc. v. Hunt, 5 W.W. Harr. 339, 168 A. 87; Finch v. Warrior Cement Corporation, 16 Del.Ch. 44, 141 A. 54. Since in the instant case there is no impairment of the rights of either creditors or dissenting stockholders, the Drug and Finch cases do not apply.
I conclude therefore that a de facto merger has not been effected.

2. Was there any fraud in this transaction?
Hadley Case, at the time that he submitted to Maracaibo his proposition that Maracaibo acquire the Case Pomeroy companies, was the indirect owner of a large percentage of the stock of the Case Pomeroy companies, was a director of Maracaibo, and was serving as a member of a special committee to investigate any proposals for the acquiring of oil properties or interests therein which might be considered. At the request of the other members of the committee he gave to the committee such information as it desired relative to the Case Pomeroy companies and participated in the discussions of the committee and of the board of directors as to the advisability of accepting or rejecting this proposition. He did not attend the final meeting of the committee in which this proposal was approved and did not vote on the transaction at the meeting of directors.
Plaintiffs contend that not only was Case not dealing at arm's length in the negotiations which took place prior to the execution of the agreement for exchange of stock, but that in his efforts to further the proposed transaction he was guilty of actual fraud as well. As contended by plaintiffs, the major breaches of fiduciary duties by Case may be enumerated as follows:
1. The concealment by Case of the fact that a key-man in the Case Pomeroy companies, named Haskell, had planned to retire and would only be available as a half-time employee;
2. That Case deliberately concealed from the committee certain expenses relative *317 to the so-called "New York overhead" amounting to approximately $40,000 a year;
3. That he failed to disclose to the committee the oil reserve estimates of Case Pomeroy used for tax and accounting purposes;
4. That through certain employees of Case Pomeroy, Case was able to influence Dennis in Dennis' appraisal of the Case Pomeroy companies by overvaluing the properties of Case Pomeroy;
5. That Case was afforded an advance review of Dennis' report, a fact which he denied at the meeting of stockholders.
Plaintiffs contend that the failure on the part of Case to disclose fully to the board of directors of Maracaibo the fact that Haskell would only be available as a part-time employee was a fraud on Maracaibo. I do not agree. In the first place, Haskell is remaining as a part-time employee. In the second place, considering the nature of this whole transaction, Case's omission may well have been an inadvertence. Moreover, the record shows that at some stage of the transaction Case mentioned this fact to Easley, who was the only director, outside of Case himself, who had any great background in the oil business and who seemed to be the leading figure in the negotiation on the part of Maracaibo. Haskell was only a small part of the management. Apparently the man whose services Maracaibo most desired was Case himself. I do not consider the actions of Case in this respect deliberately misleading.
As to the concealment of the New York overhead, the appraisal made by Dennis and the other appraisals referred to in this case, were all appraisals of properties. It is true that the water and ditching business was appraised on an earnings basis and that undoubtedly some consideration should have been given to this item in making this appraisement. There is no evidence in this case to indicate that this omission was intentional. In fact, the circumstances would seem to indicate otherwise. In view of the fact that Dennis made certain large deductions for administrative expenses exceeding $50,000 per annum, it may well be that all parties concerned considered that item of administrative expenses well covered. I therefore do not consider this omission on the part of Case, if it was an omission, as indicating lack of good faith on Case's part.
I do not entirely understand plaintiffs' allegation that Case concealed the oil reserve estimates which Case Pomeroy used for tax and accounting purposes. I do not recall anything in the record to show that any request was ever made for this information. The appraisement which Dennis was making was an appraisement of what he considered to be the actual value of these properties, not to check other figures as to their correctness. The only testimony relative to the matter is that they were conservative figures, made for tax purposes. While this information might or might not have been of some assistance, I fail to see how these figures could or should have been controlling. In fact, they might well have been misleading. Certainly there is no evidence here of any fraud.
Relative to the charges that Case secretly influenced Dennis' valuation through Case Pomeroy employees at Fort Worth, Texas, I find nothing amounting to more than suspicion in this contention. Dennis was instructed to proceed to Fort Worth and to contact these men and obtain from them the information which they had relative to the properties of Case Pomeroy and their location. He did exactly as he was instructed and again I find nothing more than suspicion to show that he was in any manner influenced improperly by either or both of these men. In fact, all of the positive testimony is directly to the contrary.
At a conference in Dennis' office with Case and Rice, Dennis' report was lying on his desk. Case saw the report and did get a glance at some of the figures. There is nothing to show in the record that he examined the report. There is nothing to show that he attempted to persuade Dennis to make any changes in the report before its submission to the board of directors. At the meeting of the stockholders, in a rather heated discussion with one of the stockholders, Case made the statement that *318 he had not seen the report. Obviously, what he intended to imply was that he had not examined the report. There is nothing in the record to show that he had. I see no merit in this contention.
This is not a case where a majority of the board of directors are officers of the other company involved. In such a case, if there had been no ratification by the stockholders, the burden would be on those who were asserting the validity of the transaction to prove that the transaction was an arm's length transaction and that the interests of the corporation were fully protected. Kerbs v. California Eastern Airways, Del.Ch., 83 A.2d 473; Gottlieb v. Heyden Chemical Corp., Del.Ch., 83 A.2d 595. Here, while it is true that Case was acting in a dual capacity, there were nine other directors on Maracaibo's board and Case was only one of several directors on the committee which recommended the transaction. All of these directors were prominent in financial, legal, and business affairs in the City of New York and vicinity. It would be difficult to conceive that Case could deceive or mislead all of them to the extent that they would permit him to take an unfair advantage of Maracaibo. It is not unusual for corporations to have directors who are also directors in other corporations in a similar line of business. This is frequently advisable in order to secure directors who will function properly. Bearle and Means, The Modern Corporation and Private Property (1933), p. 231, see n. 15.
It is perhaps unfortunate that Case continued as a member of the committee after the beginning of these negotiations  although he did not attend the meeting of the committee at which the proposal was approved,  and it is the duty of this court to scrutinize carefully his actions while acting in such a dual capacity. Nevertheless, a careful examination of the record does not disclose anything amounting at most to more than a suspicion of overreaching or fraud on the part of Case or any failure on his part to give to Maracaibo in this transaction every right to which it was entitled.
I conclude that Hadley Case did not attempt to take any unfair advantage or to perpetrate any fraud upon Maracaibo in those negotiations.

3. Did the directors of Maracaibo act in good faith and with due diligence?
In the consideration of this proposal the directors of Maracaibo employed one Richard C. Dennis, a geologist of some repute. Dennis had previously appraised the Maracaibo properties for Maracaibo. Apparently it was for this reason that Dennis was employed by the board of directors to make this appraisement. After the completion of Dennis' report, but before it was submitted to the directors of Maracaibo, Dennis, at the request of Easley, one of the directors of Maracaibo seemingly in charge of these negotiations, re-examined several properties of Case Pomeroy and as a result thereof increased his valuation thereon to the extent of $321,809. Upon receipt of the appraisement the special committee and the president had the report examined by another geologist and by the vice-president in charge of the oil and gas department of the Empire Trust Company of New York City. They agreed that Dennis' report was favorable to Maracaibo.
Plaintiffs contend that Dennis' report is incomplete, in particular, in that it does not contain a complete list of all the Case Pomeroy companies; that it is unfavorable to Maracaibo in that the properties of Maracaibo are under-appraised and the properties of Case Pomeroy are over-valued; that Dennis improperly raised the appraisement of certain Case Pomeroy companies to the extent of $321,809; that the shares of Maracaibo issued to Case Pomeroy amount to approximately 36 per cent of the total Maracaibo stock to be outstanding; that no consideration was given by the board of directors of Maracaibo to the fact that the stock of Maracaibo was listed on the New York Curb Exchange, whereas, the stock of Case Pomeroy was sold "over the counter"; that there is a gross disparity between the value of 1,103,526 shares of Maracaibo stock and all the stock of the Case Pomeroy companies and that the *319 board of directors should have known of such disparity; that the directors permitted themselves to be misled by the representations of Case to the extent that in their deliberations and in their decisions the board of directors exhibited a reckless indifference to the interests of Maracaibo.
Plaintiffs contend specifically that there is such a gross over-valuation of Case Pomeroy companies as to amount to waste. They call attention to the admitted misvaluation of property of Case Pomeroy in Crane County, Texas, amounting to $43,500. They aver that the revision of $321.809 above referred to was unwarranted. Plaintiffs also advert to an appraisal of a group of royalities appraised by the witness Wheeler at $231,007.25, whereas the valuation placed thereon by Dennis amounted to $730,498. Plaintiffs also excepted to the valuation of the so-called "water and ditching business" of Case Pomeroy, on which plaintiffs' witness Fuellhart placed a valuation of $258,000, whereas the valuation placed thereon by Dennis amounted to $852,000. Defendants' experts took exception to these valuations.
The discrepancy between these figures, according to plaintiffs, was due to improper methods used by Dennis. In making his appraisement of the water and ditching business Dennis multiplied the average cash earnings over a period of four years by six, before depreciation and without deducting "New York overhead". Plaintiffs contend that both depreciation and "New York overhead" should have been deducted. Plaintiffs also contend that the multiple used by Dennis should have been somewhat less than six. Another factor entering into these computations was the discrepancy in the testimony of experts as to the estimated life of the Bradford Field, in which at least a substantial part of this business was located. Plaintiffs contended that the estimated life of the business was approximately four years; defendants averred that it was approximately fifteen years. Defendants also averred that if the property were valued at a replacement price or on the theory of a ready buyer and a ready seller this business would be worth fully $1,000,000.
It is impossible for me to determine the correctness of this testimony with respect to certain definite items, since it is highly technical and in hopeless conflict. Fortunately, I do not find it necessary to do so, since I do not have any difficulty in arriving at conclusions as to certain important items in dispute. I am convinced that the estimated life of the business in Bradford Field is much nearer the period of fifteen years as figured by defendants' experts than the four-year period as figured by plaintiffs' experts. The earnings of the business are adequate and sufficient to warrant an appraisement at a figure much closer to the figure of Dennis and the other experts called by defendants than it is to the figure reached by plaintiffs' experts. I therefore do not find the appraisement of Dennis as to the water and ditching business so excessive as to amount to waste.
As to Dennis' re-examination of certain Case Pomeroy companies I find the facts to be as follows: Case spoke to Easley about certain developments occurring in Case Pomeroy which Case felt required revision of Dennis' memorandum. Easley advised Case to take up these revisions with Dennis. Easley further instructed Dennis to re-examine his appraisement as to these properties. The amount of the suggested new appraisement of Case was $366,511. Dennis' new appraisement amounted to $321,809. This is objected to by plaintiffs on the ground that such revision was unwarranted and also on the ground that the revision was made because of circumstances occurring since December 1, 1951, the date as of which the appraisement was to be made.
It is true that the appraisement was to be made as of December 1, 1951. It is also true that Dennis' supplemental report covering these revisions was very meager. However, Dennis' report was submitted to the board of directors and approved. It was later approved by the stockholders as a part of the action of the board of directors. I see no reason why the board of directors might not, in good faith and as a matter of fairness, agree to permit a new appraisement of these properties if the circumstances should warrant. The accuracy *320 of Dennis' supplemental report is not affirmatively attacked. The only evidence offered to refute it amounts only to suspicion. I cannot therefore say that Dennis' revision of the Case Pomeroy properties amounted to waste.
There are other items in Dennis' report questioned by plaintiffs, in which the amounts involved are considerably less. For the same reasons herein set forth, I cannot say that the board of directors in approving these items, as they did, after apparently careful investigation, exhibited a reckless indifference to the rights of dissident stockholders or amounted to waste.
Defendants offered another reason for the acceptance of Dennis' original and supplemental appraisement, namely: the fact that Dennis' appraisement of the properties of Maracaibo was greatly in excess of the appraisement of these properties made by De Golyer and McNaughton for Maracaibo a short time previously and the appraisement made by Ralph Davis of these properties for Case Pomeroy. According to the testimony, both of the latter firms are very highly regarded in the oil appraisal field.
The record shows that the appraisement of Maracaibo properties by Dennis amounted to $16,562,219, having a present worth value based upon a discount of six per centum of $12,409,274. The report of De Golyer and McNaughton shows a total valuation of the same properties in the sum of $14,928,902; the present worth value, figured in the same manner, would be $11,223,215. The report of Ralph Davis shows a valuation of $10,621,975, which would have a present worth value on a comparable basis of $7,874,443. The clear weight of the evidence is to the effect that the high appraisal of Maracaibo properties by Dennis would more than overcome any deficiencies in Dennis' report otherwise. The testimony also shows that it was so considered by the board of directors, after securing the opinion of a number of expert witnesses. I must therefore accept it as a fact. I cannot therefore say that the action of the board of directors of Maracaibo in considering Dennis' alleged over-valuation of Case Pomeroy properties was improper or amounted to waste or reckless indifference.

4. Does the contract between Maracaibo and Frederick R. Ryan constitute a gift or waste of corporate assets?
The considerations for the employment of Ryan, as set forth in the contract, are: (1) the services which Ryan would render to Maracaibo as a consultant; and, (2) Ryan's agreement not to compete with Maracaibo. However, the fact that these considerations are set forth in the agreement does not prevent the plaintiffs from showing by parol evidence a contrary intention. Gottlieb v. Heyden Chemical Corp., supra. The depositions offered in evidence by both plaintiffs and defendants (It was stipulated by counsel that the depositions, with the exhibits attached thereto, should constitute the whole of plaintiffs' testimony as far as the Ryan contract was concerned) indicate strongly that the principal, if not the paramount, consideration was the intent of the board of directors of Maracaibo to pay Ryan for services previously rendered. While the testimony of these witnesses varied somewhat in extent, all of them testified frankly that Ryan was being paid for past services as well as for future services. I am convinced that by far the larger part of the compensation provided under this contract for Ryan was in payment for past services. In arriving at this conclusion, I have considered certain essential facts which to me are controlling, namely: the fact that Ryan was over 70 years of age at the time of the execution of the contract; Ryan's state of health  he had sustained a stroke in 1950, from which he had not entirely recovered, all of which was very noticeable from the record of his deposition; the fact that nowhere in the agreement is there any attempt to "spell-out" the work which Ryan would be expected to perform; the fact that the record does not disclose that there was any such definite arrangement; the fact that Ryan's salary as a consultant would be equally as great as his salary as president and general manager of Maracaibo (this does not include the amount which he received as general counsel, a position which Ryan has relinquished); the fact that in spite of Ryan's age and condition of health, although the contract *321 is for life, it fails to provide as to what would be Ryan's position in relation to this employment should he again become incapacitated and be unable to perform his duties. Such a contract constitutes an illegal gift of corporate assets. The fact that there may be some consideration for the contract is not controlling. If the value of the compensation to be paid to Ryan is so out of all proportion to the value of the services which he would be expected to render that no reasonable person would consider that the corporation would receive a quid pro quo, then the contract would constitute a gift of corporate funds and would be illegal. Gottlieb v. Heyden Chemical Corp., supra. The fact that the contract may constitute a gift in part only does not help Ryan, since a totally inadequate consideration would invoke the same principles of law as the absence of any consideration. Rogers v. Hill, 289 U.S. 582, 53 S.Ct. 731, 77 L.Ed. 1385. Since the payment to Ryan constitutes an illegal gift of corporate funds and amounts to waste, the fact that the contract was ratified by the stockholders of Maracaibo does not cure its illegality. Kerbs v. California Eastern Airways, supra; Gottlieb v. Heyden Chemical Corp., supra; Rogers v. Hill, supra.
5. What effect, if any, does the ratification by the stockholders of Maracaibo have upon the agreement for exchange of stock or the contract with Ryan? Under such circumstances, unless the action of the stockholders constituted a gift, was ultra vires, illegal or fraudulent, this action would cure any defect. Kerbs v. California Eastern Airways, supra; Blish v. Thompson Automatic Arms Corp., 30 Del. Ch. 538, 64 A.2d 581.
Mere inadequacy of price, unless so gross as to lead the court to conclude that it was due not to an honest error of judgment but rather to bad faith or to a reckless indifference to the rights of others interested, will not reveal fraud. Cole v. National Cash Credit Ass'n, 18 Del.Ch. 47, 156 A. 183; Robinson v. Pittsburgh Oil Refining Corp., 14 Del.Ch. 193, 126 A. 46; Davis v. Louisville Gas & Electric Co., 16 Del.Ch. 157, 142 A. 654.
Even in cases, such as a case involving interlocking directorates, where the burden is upon the directors to prove the validity of their action and their good faith, a stockholder ratification shifts the burden of proof to the objector. Gottlieb v. Heyden Chemical Co., supra.
Relative to the agreement for the exchange of stock, I find nothing in the record to suggest a gift, or that the agreement was ultra vires or illegal. I have already determined that there was no fraud. I must therefore conclude that the stockholder ratification of the agreement for the exchange of stock cured any defect which may have existed in this transaction. It is therefore a legal and binding agreement.
As to the contract with Ryan, for the reasons heretofore given, I conclude that the salary arrangement with Ryan constituted a gift of corporate funds amounting to waste. Kerbs v. California Eastern Airways, supra; Gottlieb v. Heyden Chemical Corp., supra; Rogers v. Hill, supra. I therefore find that the agreement with Ryan was not cured by the ratification of the stockholders of Maracaibo and that it is therefore null and void.
Objection was made at the trial to a question put to the witness Kenneth Meyer, vice-president and general manager of the water and ditching business of Case Pomeroy, on the ground that he was not an expert and that the question was not proper in re-direct examination. Later, in plaintiffs' brief they objected upon the further ground that the answer of the witness was not proper to prove value.
Permitting such a question in re-direct examination is within the discretion of the court. Throughout the trial I permitted questions at any stage in the proceedings where it seemed that the answers thereto would have evidential value. There is no merit to the objection on this ground.
The witness had had many years of experience in this particular business. The owner of property is deemed qualified by reason of his relationship as owner to give estimates of the value of what he owns. The weight of such testimony is, of course, *322 affected by his knowledge of the values. See cases cited in 20 Am.Jur., Sec. 892, p. 751, N.S. 14, 15, 16 & 17. The managing director of a corporate owner has been held to come within this rule. Jones on Evidence, Vol. 2, Sec. 363, p. 680. This practice has been long followed in this state. See Allied Chemical & Dye Corp. v. Steel & Tube Co., 14 Del.Ch. 64, 122 A. 142; Sterling v. Mayflower Hotel Corp., Del.Ch. 1952, 89 A.2d 862, 870.
Plaintiffs made no objection to the answer of the witness as not responsive, as evidenced by the following question put to the witness by plaintiffs' counsel: "And in arriving at the value that you just testified to what method did you use?" The answer of the witness was intended to place a value upon the business and was so accepted at the time by counsel and by the court. Since the witness was qualified to give such testimony, it should not now be stricken.
Objection was also made at the trial to the admission of an oral report which the witness Fitting, a geologist, testifying as an expert, made to the management and directors of Maracaibo relative to his examination of portions of Dennis' report.
One of the defenses in this case is the allegation that the board of directors of Maracaibo had the advice of experts who had checked Dennis' report. This testimony is clearly admissible to show that the board of directors of Maracaibo received such a report. See 6 Wigmore, Evidence (3d Ed. 1940), Sec. 1788.
An order will be entered on notice in accordance with this opinion.