## S. S. WHITE DENTAL MFG. CO. v. UNITED STATES.

### No. 44602.

Court of Claims.

April 7, 1941.

Harry Levine, of New York City, for plaintiff.

John W. Hussey, of Washington, D. C., and Samuel O. Clark, Jr., Asst. Atty. Gen. (Robert N. Anderson and Fred K. Dyar, both of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

JONES, Judge.

Plaintiff, a manufacturer of dental supplies, operated three plants during and previous to the year 1936; one at Northwood, in the suburbs of Philadelphia, one at Frankford, Pennsylvania, and one at Staten Island, New York City.

On April 1, 1936, the Board of Directors decided to build an additional plant in connection with the main plant at Staten Island and to move the machinery and personnel of the Northwood plant to the new plant at Staten Island and to dispose of the buildings and grounds at the Northwood plant as soon as the Staten Island plant should be ready, which it was estimated would be within about one year.

The pertinent part of the minutes of the meeting of the executive committee held April 1, 1936, is as follows:

"Resolved, That operations now housed in Northwood Plant are to be transferred to Staten Island Factory. To consolidate these operations there is to be erected at Staten Island a new building, the cost of which is estimated at $170,000.00. In addition to this capital investment, there will be expenses estimated as follows:

Moving Equipment .......... $16,914.00
Moving Employees .......... 5,000.00
Rearranging Factory Activities 2,500.00
_____
24,414.00

"The result to be obtained is an estimated annual saving in expense of $30,649.00.

"The ultimate result of the adoption of this plan is the housing of all manufacturing operations and Head Office Departments incidental to manufacturing at Staten Island Plant, thereby effecting economies estimated at $110,000.00 a year.

"At a later date, after the Northwood moving has been completed, consideration will be given to the transfer of Frankford operations to Staten Island.

"C. A. Thomas, Secretary."

This action is brought for the recovery of $18,187.66 of the income and undistributed profits taxes paid by plaintiff for the year 1936.

Plaintiff claims this amount as a deduction for extraordinary obsolescence upon the consolidation of two of its plants and the consequent abandonment and disposition of one.

The plaintiff relies upon section 23 of the Revenue Act of 1936, 26 U.S.C.A. Int. Rev.Code § 23(*l*). The applicable part of that section is as follows:

"§ 23. Deductions from Gross Income.

"In computing net income there shall be allowed as deductions: * * *

"(*l*) *Depreciation.* A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence."

Treasury regulations issued under the Revenue Act of 1936 are in part as follows:

"Art. 23 (1)–1. *Depreciation.*—A reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business may be deducted from gross income. For convenience such an allowance will usually be referred to as depreciation, excluding from the term any idea of a mere reduction in market value not resulting from exhaustion, wear and tear, or obsolescence. * * *

"Art. 23 ·(1)–2. *Depreciable property.* The necessity for a depreciation allowance arises from the fact that certain property used in the business gradually approaches a point where its usefulness is exhausted. The allowance should be confined to property of this nature. In the case of tangible property, it applies to that which is subject to wear and tear, to decay or decline from natural causes, to exhaustion, and to obsolescence due to the normal progress of the art, as where machinery or other property must be replaced by a new invention, or due to the inadequacy of the property to the growing needs of the business. * * * * * *

"Art. 23 (1)–6. *Obsolescence.*—With respect to physical property the whole or any portion of which is clearly shown by the taxpayer as being affected by economic conditions that will result in its being abandoned at a future date prior to the end of its normal useful life, so that depreciation deductions alone are insufficient to return the cost or other basis at the end of its economic term of usefulness, a reasonable deduction for obsolescence, in addition to depreciation, may be allowed in accordance with the facts obtaining with respect to each item of property concerning which a claim for obsolescence is made. No deduction for obsolescence will be permitted merely because, in the opinion of a taxpayer, the property may become obsolete at some later date. This allowance will be confined to such portion of the property on which obsolescence is definitely shown to be sustained and cannot be held applicable to an entire property unless all portions thereof are affected by the conditions to which obsolescence is found to be due."

Numerous decisions are cited by both plaintiff and defendant.

It is practically impossible to find a definition of obsolescence that may be applied generally to all cases. Most of the definitions that are set out in the numerous decisions are intimately linked to the facts in each case.

■ It is required that the taxpayer show that the physical properties are being affected by economic conditions that will result in their being abandoned at a future date prior to the end of their normally useful life; that the time of the beginning of the obsolescence be shown; and that a reasonably definite time be ascertained as to when the property will become obsolete.

■ The question presented ·is whether a taxpayer is entitled under Section 23(*l*) to an allowance for extraordinary obsolescence of a plant solely because of its abandonment after erection of an addition to another plant and the transfer of the activities of the abandoned plant to the new addition. The question must be answered in the negative for the reasons, briefly, that Section 23(*l*), as construed by the courts and the Board of Tax Appeals, requires as a prerequisite to an obsolescence allowance proof that the abandoned property was in fact obsolescent, and that the mere fact of abandonment and transfer to a newly erected building fails to supply this prerequisite.

■ It is incumbent upon taxpayer to place in the record evidence showing obsolescence and where facts appearing therein are so meager as to leave the existence and degree of obsolescence matters of conjecture, the allowance will be denied. Rising Sun Brewing Co. v. Commissioner, 22 B.T.A. 826; Appeal of Benjamin Booth & Co., 4 B.T.A. 248.

■ We do not believe that the facts in this case justify a finding that the physical properties were obsolescent.

The facts clearly indicate that the underlying reason for the abandonment and disposition of the Northwood plant was to save the extra operating costs of maintaining the two plants. The ultimate purpose, as disclosed by the minutes of the directors' meeting and by the testimony, was to abandon the third plant also and to consolidate the entire operations at the headquarters plant at Staten Island.

The Northwood plant was adequate. It was located in a desirable industrial center. It was easily accessible for all purposes. It was in good condition and satisfactory in operation. The primary reason for the decision to consolidate the two plants at Staten Island was that current expenses of

operation could be reduced thereby. The manager of the Staten Island plant and one of the directors of the plaintiff company, testified as follows:

"21. X Q. Were you a party to the decision to close the Northwood plant and transfer the activities of the corporation to New York? A. Yes.

"22. X Q. The Northwood plant was in good condition, was it? A. Yes.

"23. X Q. The business of the corporation was not suffering any by reason of the plant being located at Northwood, was it? A. Only the extra expense of running two organizations.

"24. X Q. You felt that there would be an economy by concentrating the two plants in one? A. Yes.

"25. X Q. Aside from that, the plant at Northwood was satisfactory and was not inadequate? A. No.

"26. X Q. It was all right except for that one point that you raised? A. Yes."

This particular witness, who had been with the company 32 years and who knew more about the details of plaintiff's business than any other witness, at no time intimated that the plant was inadequate, or that it was becoming or was even likely to become obsolete. His testimony on the contrary was to the effect that the plant was adequate and satisfactory, and that the sole reason for consolidation and disposition was the saving of operating costs. He did not indicate that there was any functional depreciation in any way.

The only witness who indicated that the factory was outmoded in any way was the real estate expert who made the appraisal for the plaintiff company. He gave as a reason the fact that most of the people today want a streamlined factory. He said he was not a builder nor an engineer. He, of course, was not familiar with the details of plaintiff's business. The manager of the Staten Island plant was better qualified to judge as to the adequacy of the plant than was the real estate expert. The manager testified that the Northwood plant was satisfactory and not inadequate.

The change was made pursuant to a resolution adopted by the Board of Directors. Significantly no mention is made anywhere in the resolution of obsolescence as a reason for the action taken.

In this particular instance all the equipment was transferred from the Northwood to the new Staten Island plant. The equipment, therefore, is not involved. The question is whether the buildings were on the way to becoming obsolete.

The appraiser in his report to the plaintiff company described in detail the physical properties.[1]

---

[1] In compliance with your request, I made an inspection .of the property known as the Northwood plant situated at the northwest corner of Unity and Oakland Streets in the Twenty-third Ward of the City of Philadelphia, Pennsylvania, which consists of an improved piece of ground with a frontage of 318 feet 11⅛ inches along the east side of Oakland Street, 50 feet wide, by a depth of 205 feet 10⅛ inches along the north side of Unity Street, 50 feet wide, and 276 feet 10¼ inches along the south side of the Frankford branch of the Philadelphia and Reading Railroad, with 444 feet 11¼ inches frontage along the south side of Horrocks Street, not opened, in the rear and containing a total ground area of approximately 87,120 square feet. Street improvements are in.

The location is in the well known Frankford industrial center and is within close proximity to the heart of the city and enjoys easy means of distribution to any part of the city or its suburban areas with numerous good roads and adequate trolley and bus transportation facilities. Within a short radius of the plant are adequate housing accommodations with splendid recreational, school, church and shopping facilities.

Erected on the lot are 10 buildings as follows:

Building No. 1: A 3-story (no basement) well-lighted, modern brick factory building, approximately 241 feet by 64 feet, of slow-burning interior construction with asphalt roof, wood floors, serviced with hot and cold water, gas and electricity; sprinkler throughout, with three fire towers; toilet rooms on each floor; 25,000-gallon sprinkler tank at the top of the stair well; having an average ceiling height of over 16 feet; equipped with a 4,000-pound freight elevator and 21,000-pound built-in Howe floor scales on the first floor, a fireproof storage vault under each of the two end fire towers. Underground tunnel connects buildings No. 1 and No. 2.

Building No. 2: One-story brick and concrete building with heavy Monitor type timber roof, slag finished; equipped with a 150-horsepower boiler for heating various buildings and supplying process steam and hot water and a 350-gallon

There is no evidence that any of these buildings were in other than first-class condition. On the contrary, the appraiser's report shows them to be in good condition.

We find that the evidence fails to show that the physical plant in Northwood on April 1, 1936, was on the way to becoming obsolete. Under the facts as disclosed by the evidence the plaintiff is not entitled to recover on the ground of obsolescence. Real Estate-Land Title & Trust Co. v. United States, 309 U.S. 13, 15, 16, 17, 60 S.Ct. 371, 84 L.Ed. 542; Olean Times-Herald Corporation v. Commissioner, 37 B.T.A., 922, 924, 925.

From the Real Estate-Land Title & Trust Co. case, supra [309 U.S. 13, 60 S.Ct. 372, 84 L.Ed. 542], we quote: "This Court, without undertaking a comprehensive definition, has held that obsolescence for purposes of the revenue acts 'may arise from changes in the art, shifting of business centers, loss of trade, inadequacy, supersession, prohibitory laws, and other things which, apart from physical deterioration, operate to cause plant elements or the plant as a whole to suffer diminution in value.' * * * Such specific examples illustrate the type of 'economic conditions' whose effect on physical property is recognized as obsolescence by the Treasury Regulations. Others could be mentioned which similarly cause or contribute to the relentless march of physical property to the junk pile. But in general, obsolescence under the Act connotes functional depreciation, as it does in accounting and engineering terminology. * * * To be sure, reasons of economy may cause a management to discard a title plant either where it has become outmoded by improved devices or where it is acquired as a duplicate and therefore is useless. But not every decision of management to abandon facilities or to discontinue their use gives rise to a claim for obsolescence. For obsolescence under the Act requires that the operative cause of the present or growing uselessness arise from external forces which make it desirable or imperative that the property be replaced."

James M. Talbot is one of the directors of the company. He was present when the decision was made and had a part in it. He had peculiar knowledge of the motives that actuated the change. To his credit it may be said that he made no effort to shade or color his testimony.

However, the minutes of the directors' meeting, the fact that the equipment was moved and not discarded, the favorable location of the Northwood plant, the stated purpose of operative saving, the good condition of the buildings at Northwood, all indicate with compelling force that it was a desire to save operating expenses and not obsolescent buildings that caused the plaintiff to consolidate the two plants, transfer the equipment and dispose of the building and grounds of the Northwood plant.

Judgment will be entered for the defendant.

It is so ordered.

---

hot-water generator; a used compressor unit; vacuum pump; vacuum receiving tank and a new boiler injector pump.

Building No. 3: One-story brick building approximately 10 x 20, containing a 1,000-gallon steam fire pump connected to a 150-horsepower boiler.

Building No. 4: One-story brick L-shaped building approximately 28 x 45, with slag-finished timber roof, used as a garage.

Building No. 5: One-story brick, steel, and concrete fireproof building, approximately 56 x 45, with Monitor type roof, toilet and shipping facilities; equipped with a large stack and breeching and known as the "Burning" room.

Building No. 6: One-story triangular-shaped fireproof, brick, steel, and concrete building, approximately 32 x 40, which has an extension of building No. 5.

Building No. 7: One-story fireproof building irregularly shaped, about 46 x 12½, with high ceiling.

Building No. 8: Three-story and basement brick dwelling, approximately 48 x 35, used as a cafeteria, rest room and first aid unit, and heated from main boiler room.

Building No. 9: Series of wooden storage sheds on a concrete base, and equipped with sliding doors in front of each bin. Approximate dimensions 80 x 12.

Building No. 10: One-story brick tool house, about 10 x 12.

Containing a total area of about 50,-000 square feet, which refers to all of the buildings.