490 P.2d 968

KAISER STEEL CORPORATION,
Appellant,

v.

PROPERTY APPRAISAL DEPARTMENT,
Appellee.

No. 582.

Court of Appeals of New Mexico.
Sept. 3, 1971.

Rehearing Denied Sept. 27, 1971.

Certiorari Denied Nov. 9, 1971.

Paul A. Kastler, Wright & Kastler, Raton, James E. Sperling, John R. Cooney, Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, for appellant.

David L. Norvell, Atty. Gen., Anne K. Bingaman, Asst. Atty. Gen., Santa Fe, for appellee.

## OPINION

WOOD, Chief Judge.

The appeal is concerned with the evaluation for ad valorem tax purposes of mine run coal produced at the York Canyon mine of Kaiser (Kaiser Steel Corporation) in Colfax County. The three issues concern: (1) the assessed valuation; (2) the refusal to allow certain claimed deductions; and (3) the method of averaging used in determining the valuation.

The property appraisal department is the successor to the State Tax Commission. Section 72–25–3, N.M.S.A.1953 (1970 Int. Supp.). Under § 72–6–7(6), N.M.S.A.1953 (Repl. Vol. 10, pt. 2) it is to determine " * * * the market value of the average annual output of such productive mineral property, * * * " Under § 72–6–7(10), N.M.S.A.1953 (Repl. Vol. 10, pt. 2) it may determine this market value "to be the ad valorem value of the mineral." The property appraisal department assessed Kaiser on the basis of its determination of market value. Kaiser protested this assessed value. Section 72–25–10, N.M.S.A.1953 (1970 Int. Supp.). A hearing was held before the property appeal board. See §§ 72–25–11 through 72–25–18, N.M.S.A.1953 (1970 Int. Supp.). The property appeal board made findings of fact and conclusions of law. Its decision affirmed the assessment. Kaiser appealed directly to this court. Section 72–25–19, N.M.S.A.1953 (1970 Int.Supp.). The issues exist between Kaiser and the property appraisal department, hereinafter referred to as "State." The school district is identified as a party only because the mine is located within the district.

All three issues concern § 72–6–7(6), supra. It reads:

"From such returns and statements, and such other information as may be available, the commission shall ascertain and determine the market value of the average annual output of such productive mineral property, including any bonus or subsidy payments, less the actual cost of producing and bringing the output to the surface and of milling, treating, reducing, transporting and selling the same, over the period of five (5) years (or so much of such period as the property has been in operation) next preceding the year in which such return is required to be made. Provided, however, that any person may elect to have his output valuation computed on an annual basis instead of on a five-year average basis. If such election is exercised, such person may not change from the one-year basis except with the approval of the commission.

"But there shall not be included as part of such cost any amounts paid for salaries of any persons not actually engaged in the operation of such property or the milling, treatment, reduction, transportation, or selling such output, or in the immediate management or superintendence of such operations; nor shall there be included as part of such cost any amounts paid for improvements or the purchase of machinery, equipment, appliances, or for construction of mills, reduction works, transportation facilities or other buildings or structures."

*Assessed valuation.*

The market value of the average annual output is to be determined over a five year period or so much thereof as the property has been in operation. Here, a four year period is involved. The property appeal board found the total market value for the four year period. The value is calculated to be approximately $8.50 per ton for the years in question, 1968 and 1969. We use this figure hereinafter realizing there is a slight variation in the actual mathematical calculation. Kaiser contends this $8.50 per ton figure is not supported by substantial evidence.

Section 72–25–19, supra, states the basis of this court's review. One basis is whether the decision is supported by substantial evidence. We are to determine that question " * * * upon consideration of the entire record or portions of the record cited by the parties. * * *"

In determining whether a finding is supported by substantial evidence, New Mexico's traditional approach, in reviewing both court decisions and administrative decisions, has been: " * * * all disputed facts are resolved in favor of the successful party, all reasonable inferences indulged in support of the verdict, all evidence and inferences to the contrary disregarded, and the evidence viewed in the aspect most favorable to the verdict. * * *" Tapia v. Panhandle Steel Erectors Company, 78 N.M. 86, 428 P.2d 625 (1967). See Wickersham v. New Mexico State Board of Education, 81 N.M. 188, 464 P.2d 918 (Ct.App.1970). Thus, traditionally, New Mexico has looked only to supporting evidence and inferences in determining whether there is substantial evidence supporting a questioned finding.

Here, it is suggested that § 72–25–19, supra, changes this traditional approach because we are to consider "the entire record." Compare the Administrative Procedures Act, § 4–32–22, N.M.S.A.1953, (Repl. Vol. 2, Supp.1969). There may be merit to this view. See Universal Camera Corp. v. National Labor Rel. Bd., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); 4 Davis, Administrative Law Treatise (1958), § 29.03; compare the unpublished paper of Justice Oman, Judicial Review of Administrative Decisions Including the Problems of Evidence and Appeal given at the State Bar Mid-Year Institute, April 1970. There have been New Mexico Supreme Court decisions where similar language was used in the statute being reviewed, but we found none which decided the effect of such language. See Strance v. New Mexico Board of Medical Exam., 83 N.M. 15, 487 P.2d 1085, decided August 9, 1971; Young v. Board of Pharmacy, 81 N.M. 5, 462 P.2d 139 (1969); Seidenberg v. New Mexico Board of Medical Exam., 80 N.M. 135, 452 P.2d 469 (1969).

We do not decide whether a consideration of "the entire record" changes the traditional view as to the evidence and inferences to be reviewed in determining whether the evidence is substantial. It is unnecessary to do so. Under the traditional approach the evidence is not substantial.

■ The evidence supporting an assessed valuation of $8.50 per ton of mine run coal is that Kaiser made two sales at that price at the mine to a competing steel mill (Colorado Fuel and Iron). In 1968, Kaiser sold approximately 31,000 tons of a total production of 724,000 tons, which is slightly over 4%. In 1969, Kaiser sold approximately 70,000 tons of a total production of 802,000 tons—slightly less than 9%. The State claims these two sales support the inference that all the coal produced in those years had

a market value of $8.50 per ton. Kaiser asserts the sales show no more than that the tonnage sold had a market value equivalent to the sales price.

"* * * Fair market value is theoretically what a willing seller would take and a willing buyer offer. * * *" Board of Com'rs of Dona Ana County v. Gardner, 57 N.M. 478, 260 P.2d 682 (1953). See Hardin v. State Tax Commission, 78 N.M. 477, 432 P.2d 833 (1967). Here, we have no such seller or buyer. All the mine run coal produced, with the exception of the sales identified above, was produced by a Kaiser mine and transported to a Kaiser steel mill in Fontana, California. Kaiser is an integrated steel manufacturer; the York Canyon mine is a captive mine. In this situation, in considering the question of market value, we indulge in a fiction. We consider the mine as the seller; the steel mill as the buyer. United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960); United States v. Henderson Clay Products, 324 F.2d 7 (5th Cir. 1963).

As to the price between this fictional seller and buyer, Ford v. Norton et al., 32 N.M. 518, 260 P. 411, 55 A.L.R. 261 (1927), states: "* * * The market price of a commodity is the exchange value. It is determined by the demand for it in relation to the supply, and is proved, when possible, by actual sales. * * *" Here, there is no evidence of a demand for 96% and 91%, respectively, of the mine's supply except the demand provided by the Fontana steel mill. The State contends: "* * * The evidence showed that other steel mills were in operation in the years in question in Utah and Los Angeles. Such mills could, *presumably*, [our emphasis] have provided markets for a large portion of the mine's production at the same price per ton at York Canyon which Colorado Fuel and Iron agreed to pay. * * *" No portion of the record is cited in support of this "presumption." In our review of the record we found nothing on which to base this "presumption." Our review is limited to the record. Section 72–25–19, supra.

The steel mill's demand for the mine's supply shows an exchange value exists, but that demand does not determine what the value is. The fact that the steel mill took almost 96% of the mine run coal in 1968 and over 91% of the mine run coal in 1969, does not show that it took, or would have taken, the coal, as a "willing buyer," at a price of $8.50 per ton, plus freight, for the more than 1000 miles between York Canyon, New Mexico and Fontana, California. The closeness of the mine to its market, is a factor in determining the exchange value, in this case the market value, of the coal. Paxson v. Cresson Consol. Gold Min. & Mill Co., 56 Colo. 206, 139 P. 531 (1914).

Concerning both demand and accessibility of a market, Alfred A. Wheeler, 11 B.T.A. 579 (1928) states:

"Among the essential factors in determining market value are the existence of a demand and the accessibility of a market. Without a demand a rich natural resource may lie dormant and be commercially valueless. Create an active demand and the same deposit may find a ready market. The truth of this fact was demonstrated by the abnormal demand for this very product during the late war. Similarly, proximity to market may be a determining factor. Two deposits of ore, one in close proximity and the other far removed from the consuming market, will vary greatly in fair market value. In the instant case as to 1913 there is proof neither of a demand nor of an available market. * * *"

The market value of the mine run coal is based on evidence of sales of 4% and 9% of production at $8.50 per ton. This evidence does not support an inference that 96% and 91% of production had a market value of $8.50 per ton absent evidence of a market at that price. The finding utilizing a market value of $8.50 per ton for all mine run coal is not supported by substantial evidence. See the discussion of probative evidence in Young v. Board of Pharmacy, supra.

The State also asserts that the finding of the property appeal board is correct as a

matter of law. It relies on cases concerned with gross income from mining in determining the allowance for depletion under 26 U.S.C.A. § 613. An issue in such cases is the "representative field or market price," where, as here, the taxpayer is an integrated producer and user of the mineral to be valued. See Bingaman, 10 Nat.Res.J. 415, at 428–429 (1970).

Chief reliance is placed on Part III "Depletion Issue—Howell Field" of the opinion in Panhandle Eastern Pipe Line Co. v. United States, 408 F.2d 690, 187 Ct.Cl. 129 (1969). Panhandle Eastern States: " * * * Absent any other comparable wellhead sales of comparable gas, the one such sale in question certainly constitutes evidence indicative of the market price of plaintiff's production in the Howell Field. * * * " In Panhandle Eastern the issue was the value of the production, other than the one sale referred to in the quotation. Here, the issue is the value of the production, other than the two sales established by the record. To this extent, Panhandle Eastern is comparable. But in Panhandle Eastern there were additional facts. There was evidence of the price at which the remainder of the production was sold. That price was a delivered price after transportation. In Panhandle Eastern the delivered price was used, after delivery costs were subtracted, and the result was held to be the market value of this gas, that is, the gas apart from the one sale. The decision in Panhandle Eastern is consistent with the view that market value requires a demand at a price.

In Kaiser's case, there is evidence of a demand, at a price, but we do not consider this evidence because it supports Kaiser's rather than the State's, per ton valuation. Following the traditional view as to the evidence to be reviewed in determining substantial evidence, we consider only evidence supporting the questioned valuation. We have already held that the evidence is not substantial. The question here is whether, under Panhandle Eastern, our decision is erroneous as a matter of law. It is not because Panhandle Eastern dealt with facts

not before us. There is no evidence of a delivered price which supports the State's $8.50 per ton valuation. The quotation from Panhandle Eastern does not require the State's valuation be upheld as a matter of law because that quotation was neither the factual nor legal basis for the decision in that case.

Other cases relied on by the State are also distinguishable. In Hugoton Production Company v. United States, 349 F.2d 418, 172 Ct.Cl. 444 (1965) there were comparable sales in the area. In Riverton Lime & Stone Co., 28 T.C. 446 (1957) the taxpayer had sold his entire production and the question was the value of a portion of the production sold in a different form. In Greensboro Gas Co., 30 B.T.A. 1362 (1934), aff'd 79 F.2d 701 (1935), the taxpayer had purchased gas and the price paid for the purchases supported the valuation fixed by the taxing authority. Further, in Greensboro, supra, the valuation was not attacked. We have no evidence in the present case comparable to that utilized in the above cases. Other authority cited by the State is similarly distinguishable. We hold that the depletion cases, under the Internal Revenue Code, do not require a result, as a matter of law, other than the one we have reached.

■ Finally under this issue, the State contends the burden of proof was upon Kaiser; that is, " * * * Kaiser had the burden of showing that such sales [the 4% and 9% amounts] should, * * * not be accepted as the market value of the remaining production. * * * " It asserts that Kaiser failed to meet its burden and, therefore, the State's valuation should be upheld.

We agree that the burden of proof was on Kaiser, see generally International Min. & C. Corp. v. New Mexico P. S. Com'n, 81 N.M. 280, 466 P.2d 557 (1970); S. I. C. Finance-Loans of Menaul, Inc. v. Upton, 75 N.M. 780, 411 P.2d 755 (1966). Kaiser's burden of proof was both the burden of producing evidence and the burden of persuasion. 1 Cooper, State Administrative Law, at 355 (1965); compare Mayfield v. Keeth

Gas Company, 81 N.M. 313, 466 P.2d 879 (Ct.App.1970). This burden, in this case, where the validity of the State's valuation is in issue, is not the burden of showing the correct valuation. Kaiser's burden was to show the State's valuation was erroneous. Vale v. DuPont, 7 W.W.Harr. 254, 182 A. 668, 103 A.L.R. 946 (Del.1936).

Kaiser did produce evidence on this issue; it undertook to persuade the property appeal board that the valuation was incorrect. Did Kaiser fail in its burden of persuasion because the property appeal board erroneously upheld the State's valuation? Until a legally correct result is reached, we cannot say, as a matter of law, that there has been a failure in the burden of persuasion. Discussion of Kaiser's burden of proof at this point is misleading when the decision of the property appeal board is legally incorrect. Specifically, an asserted failure in Kaiser's burden of persuasion does not require that we uphold the State's valuation when that valuation is not supported by substantial evidence.

The valuation of $8.50 per ton for the mine run coal in 1968 and 1969 is not supported by substantial evidence; the finding utilizing that valuation is incorrect. The decision applying that valuation is reversed.

*Claimed deductions.*

■ The State disallowed certain claimed deductions and the property appeal board affirmed the disallowance. Kaiser asserts this was error. Its evidence before the property appeal board was that the deductions sought were pursuant to good accounting principles. Kaiser also argued that it found nothing in the statute which prohibited the deductions.

The deductions claimed are royalties, property taxes, income taxes, depreciation and depletion. Portions of § 72–6–7(6), supra, seem specifically pertinent to two of the claimed deductions. The market value is to include bonus or subsidy payments and there is evidence that the royalty payments fall into that category. Amounts paid for improvements are not to be included as part of the costs. This seems to indicate that depreciation on such improvements should also not be included. However, there is no specific language concerning property or income taxes and depletion. Since the propriety of a deduction for these three items must be answered on the basis of general statutory language, we give our answer to all five of the claimed deductions on the same basis.

Section 72–6–7(6), supra, states the market value is to be determined:

"* * * less the actual cost of producing and bringing the output to the surface and of milling, treating, reducing, transporting and selling the same, * * *."

"Actual cost" is not defined. Kaiser asserts that in the absence of a statutory definition we should look to the evidence and that the undisputed evidence is that under good accounting principles the claimed deductions are an actual cost. This argument, and the contention that the deductions should be allowed unless there is a statutory prohibition, is met with a rule of statutory construction in tax matters.

That rule is that legislative intention to authorize a deduction must be clearly and unambiguously expressed in the statute. Reed v. Jones, 81 N.M. 481, 468 P.2d 882 (Ct.App.1970). See Field Enterprises Ed. Corp. v. Commissioner of Rev., 82 N.M. 24, 474 P.2d 510 (Ct.App.1970). Kaiser seeks deductions from the market value of its production. Since it is neither clear nor unambiguous that the claimed deductions are included in the term "actual cost," the claimed deductions were properly disallowed.

*Method of Averaging.*

The portion of § 72–6–7(6), supra, involved in this point reads:

"* * * determine the market value of the average annual output of such pro-

ductive mineral property \* \* \*, less the actual cost of producing and bringing the output to the surface and of milling, treating, reducing, transporting and selling the same, over the period of five (5) years (or so much of such period as the property has been in operation) next preceding the year in which such return is required to be made. Provided, however, that any person may elect to have his output valuation computed on an annual basis instead of on a five-year average basis. \* \* \*"

Section 72-6-7(6), supra, clearly authorizes the averaging of market value of the output over the four year period involved in this case. It is not clear whether an averaging method is authorized for the cost deduction. It depends upon whether the phrase beginning "over the period of five (5) years" modifies the "less the actual cost" phrase as well as the "average annual output" phrase.

For the tax year involved, 1970, it would be to Kaiser's advantage not to average the costs. It produced more tons of coal in 1969 and, thus, has greater production costs to be deducted in connection with that production. The advantage is in deducting the greater production costs for one year against an averaged output which includes years in which there was less production. It asserts, however, that this procedure results in a distortion when costs are related to the averaged production and, therefore, when the output is averaged, costs should also be averaged. The State does not disagree with Kaiser's position. It asserts that § 72-6-7(6), supra, can be read in both ways; that costs could be averaged or that costs could not be averaged.

We cannot determine the view of the property appeal board with certainty. Its finding No. 10 refers to averaged value of production less averaged costs of production, yet the remainder, which is the taxable value, was a figure which is not correct if costs have been averaged. Its finding No. 9 refers to total costs of production for the four year period, and this is an indication of cost averaging, yet the figure used is the cost figure for one year only. Its conclusion of law, as to a net assessable production amount, uses a figure indicating costs have not been averaged. We cannot say whether the property appeal board refused to average costs, or intended to average costs and made an arithmetical error. Thus, the administrative decision does not provide a guide to whether costs are to be averaged.

It is our view that a determination of the market value of an *average* annual output, less the actual cost, over the period of years involved requires an averaging of the costs. We so hold. We reach this result on the basis that the commas setting off the "less the actual cost" phrase are used to enclose and not to separate. State v. Clark, 80 N.M. 340, 455 P.2d 844 (1969).

The decision of the property appeal board is reversed. The cause is remanded to that board for further proceedings consistent with this opinion. Such further proceedings shall consist of new findings based on the present record and without taking additional evidence. Section 72-25-19(H), supra.

It is so ordered.

HENDLEY and COWAN, JJ., concur.