608 P.2d 514

The ANACONDA COMPANY, Plaintiff-Appellant, Cross-Appellee,

v.

PROPERTY TAX DEPARTMENT of the State of New Mexico, Defendant-Appellee, Cross-Appellant.

No. 3702.

Court of Appeals of New Mexico.

Dec. 11, 1979.

Writ of Certiorari Denied
Jan. 21, 1980.

Owen M. Lopez, Thomas W. Olson, Gary R. Kilpatric, Montgomery, Andrews & Hannahs, Sante Fe, for Anaconda Co.

Jeff Bingaman, Atty. Gen., John C. Cook and Jan Unna, Sp. Asst. Attys. Gen., Santa Fe, for Tax Dept.

## OPINION

LOPEZ, Judge.

Pursuant to §§ 7–38–39 and 7–38–40, N.M.S.A. 1978, Anaconda filed suit in the District Court claiming a refund for certain ad valorem taxes paid voluntarily and under protest for tax years 1975 and 1976. The District Court denied refund on all but a portion of the claim for 1975. Anaconda appeals the denial of the remainder of the refund in 1975 and all of the refund in 1976. The Property Tax Department cross-appeals on the portion of the refund that was allowed. There are three issues on appeal: 1. the propriety of the valuation by the Property Tax Department in 1975 of all property used in connection with uranium property at 87½% of its original cost; 2. the propriety of the denial by the Department of a deduction for obsolescence in 1976; and 3. the constitutionality of the valuation statute interpreted by the Department denying an additional 50% deduction from the

value of uranium property when the uranium is obtained from an open-pit mine while allowing this deduction when the uranium is obtained from an underground mine.

### Valuation of all Property at 87½% of Original Cost

Anaconda claimed a refund for certain ad valorem taxes paid in 1975 on the basis that, in allowing only a flat 12½% depreciation allowance from original cost, the Department improperly valued certain improvements, equipment and other personal property used by Anaconda in connection with its uranium mining and milling activities in Valencia County. The District Court upheld this claim, finding that the method of valuation prescribed by the New Mexico State Tax Commission (now the Property Tax Department) Rules and Regulations 70–4, in effect in 1975, was inconsistent with N.M.Laws 1973, ch. 258, § 17(B) (in effect during 1975) and with Article VIII, Section 1 of the New Mexico Constitution. The State appeals the allowance of a refund based on this claim.

█ In 1975 the law regarding the valuation of mineral property and property used in connection with mineral property when the primary production from the mineral property is uranium was N.M.Laws 1973, ch. 258, § 26 (current version at § 7–36–25(B), N.M.S.A. 1978). That law stated:

(B) The following kinds of property held or used in connection with uranium mineral property *shall be valued under the methods of valuation required by the Property Tax Code and department regulations*:

(1) improvements, equipment, materials, supplies and other personal property held or used in connection with all classes of uranium mineral property; . . .
(Emphasis added.)

In 1970 the New Mexico State Tax Commission adopted Rules and Regulations 70–4 to be used in the determination of the value of mineral property for ad valorem tax assessment purposes. That regulation was in effect in 1975 and read in part:

### VALUATION OF IMPROVEMENTS, EQUIPMENT, MATERIALS, SUPPLIES AND PERSONAL PROPERTY HELD OR USED IN CONNECTION WITH PRODUCTIVE MINERAL PROPERTY

. . . . .

3. In determining actual value, the State Tax Commission shall take the original cost of any improvements, equipment, materials, supplies and personal property held or used in connection with productive mineral property and subtract from said original cost 12½%, as an allowance for intangibles. This will result in a percentage of 87½% of original cost which shall constitute actual value of such above named and referred to properties.

The method prescribed in this regulation was used to value improvements, equipment and other personal property used by Anaconda in 1975. A general law regarding methods of valuation of property for taxation purposes in effect at the time required that "when no market value can reasonably be ascertained for property . . . method of valuation in general use and authorized by department regulation shall be used to determine value for property taxation purposes." N.M.Laws 1973, ch. 258, § 17(B) (current version at § 7–36–15(B), N.M.S.A. 1978). Since there was not sufficient data available to arrive at a market value for the property in question, the above statute required that the property be valued by methods of valuation in general use and authorized by the Department. A regulation was authorized by the statute. The question is whether the valuation method in the regulation was a method in general use. Based on the testimony of several witnesses, the trial court found that this method which granted a 12½% depreciation, regardless of the age of the property, was not a generally accepted appraisal technique nor a method of valuation in general use.

█ The Department argues that the method of valuation was in general use,

since it was uniformly and consistently used by the Property Tax Department for property such as Anaconda's during 1975. This argument is an attempt to justify the regulation by the fact of its own existence, and would render superfluous the statutory requirement that the method of valuation be of "general use". We decline to accept this argument. A statute must be construed so that no word or part of the statute is rendered surplusage or superfluous. *Stang v. Hertz Corp.*, 81 N.M. 69, 463 P.2d 45 (Ct. App.1969), *aff'd*, 81 N.M. 348, 467 P.2d 14 (1970).

In *Bret Harte Inn, Inc. v. City of San Francisco*, 16 Cal.3d 14, 127 Cal.Rptr. 154, 544 P.2d 1354 (1976), the Supreme Court of California held that the method of valuation of personal property where the cost of acquisition is discounted by a uniform 50% depreciation factor, regardless of age or condition of the property, is not a valid method of determining value. We agree that any property valuation method which uses one uniform percentage depreciation factor, regardless of the age of the property, is an improper method of determining property value. Such a method would not, except by mere coincidence, yield a value consistent with the fair market value of the property.

There being substantial evidence in the record to support the finding that the method of valuation prescribed in Regulation 70–4 was not generally used as a means of determining value in 1975, and there being substantial evidence of the valuation utilized by the trial court in ordering the refund, the decision of the trial court refusing to apply the regulation in valuing Anaconda's properties is affirmed.

As Regulation 70–4 is inconsistent with the statutory requirement that methods of valuation used by the Property Tax Department be generally accepted methods, we do not reach the issue of the constitutionality of the regulation. *Property Tax Department v. Molycorp, Inc.*, 89 N.M. 603, 555 P.2d 903 (1976).

1. § 7–36–33, N.M.S.A. 1978 [formerly § 72–29– 22, N.M.S.A. 1953 (Supp.1975) effective January 1, 1976] prescribes the method to be used

## *Deductions for Obsolescence*

In filling out a tax form for the purpose of computing the ad valorem taxes owed on Anaconda's property used in connection with its Jackpile-Paguate uranium mine and its Bluewater mill, Anaconda claimed a 20% deduction for obsolescence. No information supporting the claimed deduction was included on the tax form, and the Property Tax Department denied the deduction. Using the figures from Anaconda's tax return, but without including the obsolescence deduction, the Department arrived at a value for the Anaconda properties in question. Anaconda claims that without the obsolescence deduction the State's assessment is too high.

The general rule is that the taxpayer has the burden of showing that the State's valuation is erroneous. *Kaise Steel Corp. v. Property Appraisal Department*, 83 N.M. 251, 490 P.2d 968 (Ct.App.), *cert. denied*, 83 N.M. 258, 490 P.2d 975 (1971). Any assessment by the Tax Department is presumed to be correct. Section 7–1–17(C), N.M.S.A. 1978 [formerly § 72–13–32(C), N.M.S.A. 1953 (Supp.1975)]; *Addis v. Santa Fe County Valuation Protest Board*, 91 N.M. 165, 571 P.2d 822 (Ct.App.1977). When a deduction is claimed, the taxpayer also has the burden of clearly establishing his right to it. *Reed v. Jones*, 81 N.M. 481, 468 P.2d 882 (Ct.App.1970). This is also true when a right to an exemption is claimed. *United Veterans Organization v. New Mexico Property Appraisal Department*, 84 N.M. 114, 500 P.2d 199 (Ct.App. 1972). The Department asserts that any claimed diminution in property value due to obsolescence is clearly a deduction. It reaches this conclusion from reading the New Mexico statute that provides a definite method for arriving at the value of property used in connection with mineral property for purposes of ad valorem taxes.[1]

in assessing property used in connection with mineral property. The pertinent section reads:

Both parties agree that § 7–36–33, N.M.S.A. 1978 is the statute under which certain Anaconda properties were to be assessed in 1976. They disagree as to which party has the burden of establishing the amount of the deduction. Anaconda argues that the amount of deduction for obsolescence of the property need not be proven by the taxpayer because, under the statute, the Department is required to determine it. The Department has a duty to establish the tangible property cost. Section 7–36–33(C)(1), N.M.S.A. 1978. From this tangible property cost the obsolescence factor is to be deducted. Section 7–36–33(C)(2). The statute does not require the Department to establish a deduction for Anaconda. It is the taxpayer who must establish the right to a deduction. *Reed, supra.* Law in other states and federal law concerning the concept of obsolescence confirms our position that the burden is on the taxpayer to prove the amount of the deduction for obsolescence to which it is entitled.

"Obsolescence" is generally understood to be the process "whereby property, because of causes other than physical deterioration, loses its economic usefulness to the taxpayer." 4 Mertens, Law of Federal Income Taxation § 23.104 (1973). A broader definition was given by the Massachusetts Supreme Court, which stated that obsolescence "mean[s] a loss in the service value of a fixed or capital asset which has become useless or inefficient on account of advances in the art, new inventions, inadequacy, the shifting of business centers, the loss of trade or some governmental ruling." *Attorney General v. Trustees of Boston Ele-*

*vated Railway,* 319 Mass. 642, 659, 67 N.E.2d 676, 688 (1946). Interpreting a federal statute allowing a deduction from income tax for obsolescence,[2] the United States Court of Claims stated that in order to obtain the deduction the taxpayer must show that the property is being affected by economic conditions that will result in its being abandoned *prior to the end of its normally useful life. S. S. White Dental Manufacturing Co. v. United States,* 38 F.Supp. 301, 93 Ct.Cl. 469, *cert. denied,* 314 U.S. 644, 62 S.Ct. 84, 86 L.Ed. 517 (1941). (Emphasis added.) Yet not every decision to abandon property gives rise to a claim for obsolescence. *Real Estate-Land Title & Trust Co. v. United States,* 309 U.S. 13, 60 S.Ct. 371, 84 L.Ed. 542 (1940). The taxpayer must show that ordinary depreciation will not sufficiently restore the cost of the property before its usefulness is over. *Southeastern Building Corp. v. Commissioner,* 148 F.2d 879 (5th Cir.), *cert. denied,* 326 U.S. 740, 66 S.Ct. 52, 90 L.Ed. 442 (1945). He must clearly show that he is entitled to the obsolescence deduction. *Detroit & Windsor Ferry Co. v. Woodworth,* 115 F.2d 795 (6th Cir.), *cert. denied,* 312 U.S. 692, 61 S.Ct. 712, 85 L.Ed. 1128 (1940). A deduction for obsolescence will not be granted when the taxpayer fails to prove the connection between the degree of obsolescence and the amount of the deduction claimed. *Becker v. Anheuser-Busch,* 120 F.2d 403 (8th Cir.), *cert. denied,* 314 U.S. 625, 62 S.Ct. 105, 86 L.Ed. 105 (1941); *see also, S. S. White, supra.*

Because obsolescence refers to an unexpected decline in the usefulness of a tax-

C. The value of individual items of property subject to valuation under this section, except construction work in progress, shall be determined as follows:
(1) the valuation authority shall first establish the tangible property cost of each item of property,
(2) from the tangible property cost shall be deducted the related accumulated provision for depreciation and any other justifiable factors;

Section B. of the same statute defines "other justifiable factors".
B. As used in this section:

. . . . .

(3) "other justifiable factors" includes, but is not limited to, functional and economic obsolescence;

**2.** Int.Rev.Code of 1939, § 23, 52 Stat. 460 (current version at I.R.C. § 167(a)) states:
DEDUCTIONS FROM GROSS INCOME
In computing net income there shall be allowed as deductions

. . . . .

*(1) Depreciation.*—A reasonable allowance for the exhaustion, wear, and tear of property used in the trade or business, including a reasonable allowance for obsolescence . . . . .

payer's property due to external factors other than physical deterioration, its existence and degree is best ascertained by the taxpayer. Only he is fully cognizant of the actual usefulness, or productivity, of his property. It is the taxpayer's burden to show that his property has become or is becoming obsolete, and to prove the amount of obsolescence with reasonable certainty.

■ Anaconda has the burden of proving that it is entitled to a deduction for functional and/or economic obsolescence and of substantiating the amount of the deduction claimed. The trial court found that the evidence presented by the taxpayer was insufficient to establish a deduction from tangible property cost for functional and economic obsolescence. There is substantial evidence in the record to support this finding.

■ In support of its claimed 20% deduction for obsolescence, Anaconda presented a valuation report on its properties at the Bluewater mill and the Jackpile-Paguate uranium mine in Laguna. The report, hereinafter called the Valuation Report, was prepared by an independent research corporation and determined a value for Anaconda's properties using primarily the reproduction cost method. This method involves determining the cost of replacing the property with new property of the same type (replica property) and then subtracting an amount representing an estimate of depreciation and obsolescence. The value of the properties arrived at by this report was substantially lower than the value determined by the Property Tax Department computed by subtracting depreciation (a percentage fixed by tables used by the Department) from the original cost to Anaconda of the property. The difference in values, Anaconda claimed, occurred because the Valuation Report took economic and functional obsolescence into account, whereas the assessment of the Tax Department did not do so. While this assertion is correct, it does not in itself entitle Anaconda to a deduction for obsolescence. Anaconda's evidence must substantiate its claim. The taxpayer must prove, not merely assert,

that it is entitled to a deduction for obsolescence. *Bradley v. Commissioner*, 184 F.2d 860 (7th Cir. 1950); *see also, Reed, supra.*

A written critique of the Valuation Report was prepared by Mr. Harold Bertholf, a geologist specializing in the economic analysis and appraisal of mining and petroleum properties. This critique, admitted into evidence, questioned thirteen of the assumptions and procedures on which the Valuation Report was based. Three major criticisms were: 1. the lack of substantial documentation to support the short property life expectancies on which basis depreciation and obsolescence were computed; 2. the superficial use of the income approach to determining value, which Mr. Bertholf believed to be the method most capable of producing a reliable measure of obsolescence; and 3. a high degree of subjectivity in the report.

Mr. Bertholf testified at trial that functional and economic obsolescence is usually measured as a loss of earning ability, and that consequently, the best method of measuring it is the income approach to valuation. This method was used only superficially in the Valuation Report to support the value arrived at through the cost reproduction method of valuation.

Mr. Paul McDonald, an account auditor with the Property Tax Department, agreed at trial with Mr. Bertholf that the income approach to valuation is the best way to determine obsolescence. He also criticized the Valuation Report for basing its estimates of the usefulness of certain property on the assertion of Anaconda that its uranium supply would be depleted in eight years. An SEC merger report between Anaconda and Atlantic Richfield Oil Company indicated that there are an additional 11.2 million tons of low grade ore in the area. Since the price of uranium is rising, it may be economically feasible to mine this ore after 1985, in which case the usefulness of the property is more than eight years as of 1976. Mr. McDonald also pointed out that a comparison of the recovery rate of the Bluewater mill, which Anaconda claims is becoming obsolete, with that of newer inde-

pendent mills processing ore for Anaconda in 1975 showed that the Bluewater mill had a recovery rate of 89.2% while the recovery rate of the independent mills was 90.9%. This difference, said Mr. McDonald, is not significant enough to justify a claim for obsolescence of the mill. Lastly, Mr. McDonald, at trial and in the report he prepared evaluating the Anaconda Valuation Report, stated that any decreased productivity of the Bluewater mill starting in 1973 was the result of metallurgical problems encountered in the treatment of the ore being mined, and not the result of obsolescence.

From this discussion, it is clear that the trial court's finding that the Valuation Report was insufficient to support Anaconda's claimed obsolescence deduction is supported by substantial evidence. The facts found by the trial court shall not be disturbed by the appellate court so long as they are supported by substantial evidence. *Getz v. Equitable Life Assurance Society*, 90 N.M. 195, 561 P.2d 468, *cert. denied*, 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95 (1977). Since the Valuation Report was the major evidence offered by Anaconda in support of its claim, the trial court properly refused to allow Anaconda a deduction for economic and functional obsolescence in 1976.

*Constitutionality of the Valuation Statute*

In both 1975 and 1976 the Property Tax Department denied Anaconda an additional 50% deduction of the value of its uranium property which was allowed to certain other producers of uranium in the state. The Department maintains that the 50% deduction is, by statute, allowed only on the uranium coming from underground mines. Since Anaconda's Jackpile-Paguate mine is an open-pit mine, the Department refused to allow the deduction. The trial court held that Anaconda was properly denied this deduction.

Anaconda claims that § 7–36–25, N.M.S. A.1978 as interpreted by the Property Tax Department violates the 14th Amendment of the United States Constitution and is counter to Art. II § 18 and Art. VIII § 1 of the New Mexico Constitution.

Section 7–36–25 sets out a special method to be used in evaluating uranium property for property tax purposes. The statute, which existed in essentially this form in 1975–76, reads in pertinent part:

C. The value for property taxation purposes of . . . uranium mineral property is the annual net production value of the uranium mineral property.

. . . . .

E. For the purposes of this section, the "annual net production value" means:

(1) the sales price of uranium-bearing material disposed of as ore or solution, less fifty percent of that sales price as a deduction for the cost of producing and bringing the output to the surface and of transporting and selling it; or

(2) in the case of uranium-bearing material not disposed of as ore or solution but processed or beneficiated . . . the value of $U_3O_8$ contained in ore solution determined on the basis of $U_3O_8$ contained in ore or solution determined on the basis of the $U_3O_8$ content of the ore or solution at fifty percent of the taxpayer's average unit sales price during the preceding calendar year of $U_3O_8$ contained in the concentrate form commonly known as "yellowcake" . . . less fifty percent of the value as a deduction for the cost of producing and bringing the output to the surface and of milling, treating, reducing, transporting and selling uranium-bearing material severed and saved from an underground mine.

The effect of this statute is to value uranium property at the sales price of the uranium material sold with certain deductions. If a company sells uranium material as ore or solution, it is entitled to a 50% deduction from the sales price. If it sells processed uranium, commonly known as "yellowcake", it is entitled to an initial 50% deduction, and if the uranium comes from an underground mine, to an additional 50% deduction, or a total deduction of 75%. If the uranium does not come from an underground mine, the company is allowed only the initial 50% deduction in determining

property value. The Property Tax Department has interpreted the term "underground mine" to exclude open-pit mines, and denied the additional 50% deduction to taxpayers engaged in strip mining. *See* P.T.D. Reg. 29–14:3, effective January 1, 1976, which codified this interpretation. Since Anaconda's Jackpile mine is an open-pit mine, the Department denied Anaconda the extra fifty percent deduction. For the small portion of the mine where shafts and tunnels were used, however, the extra deduction was allowed. The propriety of that deduction is not at issue.

Anaconda claims that it was entitled to the extra 50% deduction on all of its production, not just on that portion attributed to underground mining. It asserts that the State, in denying it the extra deduction but allowing the deduction to taxpayers with underground uranium mines, is violating the equal protection clauses of the United States and New Mexico Constitutions, and the uniformity of taxation provision of the New Mexico Constitution. The latter section provides that:

> Taxes levied upon tangible property shall be in proportion to the value thereof, and taxes shall be equal and uniform upon subjects of taxation of the same class. Different methods may be provided by law to determine value of different kinds of property, but the percentage of value against which tax rates are assessed shall not exceed thirty-three and one-third percent.

N.M.Const., Art. VIII, § 1. Since the tests in New Mexico for violation of this section are the same as those used in determining a violation of the equal protection clause, we will discuss only the standards pertaining to equal protection. *See Gruschus v. Bureau of Revenue*, 74 N.M. 775, 399 P.2d 105 (1965); *Rust Tractor Co. v. Bureau of Revenue*, 82 N.M. 82, 475 P.2d 779 (Ct.App.), *cert. denied*, 82 N.M. 81, 475 P.2d 778 (1970).

▮▮▮▮ The equal protection clauses of the United States and New Mexico Constitutions have been interpreted similarly. The following basic principles have been evolved. 1. There must be a rational basis for the classification, *City of New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *Gruschus, supra,* and a substantial difference between the categories. *McGeehan v. Bunch*, 88 N.M. 308, 540 P.2d 238 (1975). 2. In taxation, even more than in other fields, the legislature possesses the greatest freedom in classification. *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973); *Michael J. Maloof & Co. v. Bureau of Revenue*, 80 N.M. 485, 458 P.2d 89 (1969). 3. Every presumption is to be indulged in favor of the constitutionality of the tax. *Lehnhausen, supra; Gruschus, supra.* 4. So long as the classification for taxation is reasonable, and the tax is uniform and equal on all subjects of a class, the statute is constitutional. *Gruschus, supra.* 5. The burden is on the party attacking the constitutionality of the tax to negate every conceivable basis which might support the classification. *Lehnhausen, supra; Maloof, supra.* The classification will not be set aside if any state of facts reasonably may be conceived to justify it. *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

▮▮▮▮ *Rational Basis, Legislative Freedom, and Presumption of Constitutionality.* The first and most important consideration is whether the classification is unreasonable. *See, Gruschus, supra.* Considering the broad power of the legislature to classify for tax purposes, and the presumption of the constitutionality of the tax, any reasonable justification for the classification is sufficient to sustain its constitutionality. The trial court found that there is a reasonable basis for the division of mines for tax purposes into the classes of underground and open-pit mines. The basis for the classification is the difference between the cost of producing and bringing uranium ore to the surface in the two types of mines. Since this cost is greater in underground than in open-pit mines, it was within the Legislature's power to provide a tax deduction to underground mines that it did not grant to open-pit mines. We cannot say that the classification is unreasonable.

A statutory classification will be upheld when the evident aim of the classification is to produce equality, not inequality. *Colgate v. Harvey*, 296 U.S. 404, 56 S.Ct. 252, 80 L.Ed. 299 (1935).

Anaconda claims that there is not substantial evidence in the record to support the conclusion that the classification is reasonable. In reviewing the evidence, we are mindful that presumptions are in favor of verdicts, that the reviewing court will view the facts in the light most favorable to the prevailing party, will indulge all reasonable inferences in support of the verdict, and will disregard all inferences or evidence to the contrary. *Mascarenas v. Gonzales*, 83 N.M. 749, 497 P.2d 751 (Ct.App.1972). We consider, then, only the evidence supporting the State on this issue, and in its most favorable light. At trial, Mr. Budecke, the State's expert witness and Mr. Pincock, Anaconda's expert witness, agreed that the cost per ton of bringing ore to the surface was greater in an underground than in an open-pit mine. They also agreed that the cost of bringing the ore to the surface was a major portion of the costs of producing yellowcake. Mr. Budecke, who is a licensed, registered professional mining engineer with twenty years experience in mining and six to seven years experience with the uranium industry in New Mexico, testified that the average present cost of uranium ore production from an underground mine in New Mexico is approximately $30.00 a ton compared with a cost of approximately $12.00 a ton for an open-pit mine. He also testified that the cost of production or mining far outweighs the milling costs.

The verdict of the trial court will stand as long as the findings are supported by substantial evidence. *Getz, supra.* Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate support for a conclusion. *Samora v. Bradford*, 81 N.M. 205, 465 P.2d 88 (Ct.App. 1970). The evidence discussed above is substantial evidence to support the trial court's findings that the average cost of producing and bringing uranium to the surface in an underground mine exceeds such cost in an open-pit mine.

Anaconda asserts that in comparing the cost of mining by the underground and open-pit methods, one must consider the total cost of both mining and milling. In other words, the proper comparison is made on a cost per pound of yellowcake produced, not on a cost per ton of ore extracted from the earth. The evidence indicates that Anaconda has high costs associated with milling and transportation. No evidence was offered, however, comparing the actual cost per pound of yellowcake produced from the Jackpile-Paguate mine with the cost per pound to other producers of yellowcake in New Mexico. Evidence presented by Anaconda showed that in 1975 and 1976, the actual cost of Anaconda per pound of yellowcake was about equal to or less than the *deduction* per pound allowed to underground mine owners. Extrapolating from the deduction figure one can compute an approximate cost per pound for these other producers. This figure is greater than Anaconda's reported cost per pound. Even if Anaconda's cost per pound *were* greater than that cost for underground mine owners, that fact would be irrelevant. Inequalities that result occasionally and incidentally in the application of a system not arbitrary in its classification are not sufficient to defeat the system. *Colgate, supra.* Further, even if we were to agree with Anaconda, which we do not, that the comparison between mines is better made on a cost per pound of yellowcake than on a cost per ton of ore, we would not hold this statute unconstitutional. The court cannot substitute its view in selecting and classifying for that of the legislature. *Maloof, supra.*

Anaconda claims to be the only large producer of yellowcake in New Mexico denied the benefit of the additional 50% deduction. Since other uranium producers get larger dollar deductions per pound of yellowcake than Anaconda, the company argues that its constitutional rights have been violated. This argument is without merit. In assessing an equal protection challenge, a court is called upon only to measure the basic validity of the legislative classifica-

tion. *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). Absolute equality in taxation cannot be obtained and is not required under the Fourteenth Amendment. *Colgate, supra.* The Fourteenth Amendment is not intended to compel states to adopt an iron rule of equal taxation. *Allied Stores v. Bowers*, 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959); *see, Gruschus, supra.* The fact that competitors are treated differently under a taxation classification is not important when considering the constitutionality of the statute establishing that classification. *Heisler v. Thomas Colliery Co.*, 260 U.S. 245, 43 S.Ct. 83, 67 L.Ed. 237 (1922). A classification is not unconstitutional unless it is clearly arbitrary and capricious. *Maloof, supra.*

*Substantial Difference Between the Categories.* There is a substantial difference between underground and open-pit mines sufficient to support a distinction between them for tax purposes. At least one other state has recognized this distinction, although the purpose of the statute challenged was environmental protection rather than economic equalization. In *Dufour v. Maize*, 358 Pa. 309, 56 A.2d 675 (1948), the Supreme Court of Pennsylvania, finding strip mining more destructive of the environment than underground mining, upheld a statute requiring a bond and license fee on open-pit bituminous coal mine operators, but not on underground mine operators. The Court considered the licensing and bond requirements operated as a tax on open-pit operators that was not imposed on underground mine operators, but held the statute constitutional, the classification being based on real distinctions between the types of mines.

*Uniformity and Equality of the Tax, Requirement that Taxpayer Negate Every Conceivable Basis for the Classification.* Anaconda does not claim that other owners of open-pit uranium mines have been allowed the deduction denied to it. All owners of underground uranium mines are allowed an additional 50% deduction while those owning open-pit or strip mines are denied the deduction in the assessment of uranium mineral property. The tax is thus uniform and equal on all subjects of the class.

Since the classification is reasonable, and the tax is uniform and equal on all subjects of a class, the statute is constitutional as interpreted by the Property Tax Department. Anaconda has failed to negate every conceivable basis which might support the classification. The greater cost in an underground than in an open-pit mine of producing and bringing uranium ore to the surface is a reasonable basis for the different tax treatment accorded to the two types of mines.

Anaconda's contention that its Jackpile mine should be considered an underground mine to avoid the necessity of declaring the statute unconstitutional need not be considered. No evidence was presented that the mine is an underground rather than an open-pit mine.

▆ The statute is constitutional and was properly applied to the determination of the value of Anaconda's uranium property in New Mexico in 1975 and 1976. The plaintiff is not entitled to any additional 50% deduction from its 1975 and 1976 ad valorem taxes.

The judgment of the trial court on all of the issues is affirmed.

IT IS SO ORDERED.

WOOD, C. J., and HENDLEY, J., specially concurring.

WOOD, Chief Judge (specially concurring).

I join in Judge Lopez's opinion on the first two issues—valuation at 87½ percent of original cost and the claimed deduction for obsolescence. I agree with the result reached by Judge Lopez on the constitutional issue but do not join in his discussion.

In contending that § 7–36–25(E)(2), N.M. S.A.1978 is unconstitutional, Anaconda makes three claims.

1. Anaconda contends that to avoid the constitutional issue, its open-pit mine should

be considered an underground mine for the purpose of the disputed deduction. The evidence supports the trial court's finding that Anaconda's "mining operations which resulted in the claims for refund are open-pit or strip mining operations rather than underground mining operations."

2. The deductions authorized in arriving at annual net production value distinguish between uranium-bearing material disposed of as ore or solution and uranium-bearing material which has been processed or beneficiated. Compare Subparagraphs (1) and (2) of § 7–36–25(E), supra. Contrary to Anaconda's contention, the difference between material disposed of as ore or solution and material disposed of after being processed or beneficiated provides a rational basis for distinguishing the authorized deductions.

3. Anaconda's claim, with which I agree, is that the deduction in § 7–36–25(E)(2), supra, denies it equal protection. This is "a deduction for the cost of producing and bringing the output to the surface *and* of milling, treating, reducing, transporting and selling uranium-bearing material severed and saved from an underground mine." (My emphasis.) This deduction has two parts—(1) the cost of bringing to the surface, and (2) processing costs after reaching the surface.

The record shows a difference in cost, as between open-pit and underground mines, in bringing material to the surface. This difference provides a rational basis for authorizing a deduction for this cost for an underground mine and not authorizing a similar deduction for an open-pit mine. If the deduction went only to this cost, there would not be a denial of equal protection.

The record also shows a cost, both for open-pit and underground mines, in processing the material once the material reaches the surface. On what basis is the underground mine allowed this deduction and the open-pit mine not allowed this deduction? The justification, throughout the record, goes only to the difference in cost in bringing material to the surface. This, however, goes only to the first part of the deduction.

Anaconda's evidence consistently referred to its surface processing costs and, in my opinion, negated any basis for allowing an underground mine a deduction for surface processing costs and not allowing this deduction for an open-pit mine. No justification, other than cost, has been advanced. To the extent that § 7–36–25(E)(2), supra, allows a deduction for surface processing costs only to an underground mine, the open-pit mine is denied equal protection. *Halliburton Company v. Property Appraisal Dept.*, 88 N.M. 476, 542 P.2d 56 (Ct.App. 1975).

The Legislature authorized a two-part deduction, one part of which is unconstitutional. The amount of the deduction (the 50%) does not distinguish between the two parts. The legislative intent is clear, that the two parts of the deduction apply only to underground mines. In light of the legislative intent shown by the unambiguous statutory language, the deduction cannot apply to any mine. It cannot apply to underground mines because the deduction unconstitutionally favors underground mines in connection with surface processing costs, and the statute does not distinguish between the amount of this improper deduction and a deduction which would have been proper (bringing material to the surface). It cannot apply to open-pit mines because the Legislature did not intend any part of this deduction for open-pit mines.

Because Anaconda is not entitled to this deduction, I agree with Judge Lopez's result as to this issue.

HENDLEY, J., concurs.